# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**LP&D, INC.,**<br><br>                 **Debtor**<br>———————————————<br>**JOHN J. AQUINO, as he is Chapter 7 Trustee,**<br><br>                 **Plaintiff**<br><br>**v.**<br><br>**ECOSOURCE, LLC,**<br>**PAUL OLIVEIRA, and**<br>**LISA ELLIS-OLIVEIRA,**<br><br>                 **Defendants** | **Chapter 7**<br>**Case No. 12-14894-FJB**<br><br><br><br><br><br>**Adversary Proceeding**<br>**No. 14-1107** |

**MEMORANDUM OF DECISION**

## I.    INTRODUCTION

The above-captioned bankruptcy case and adversary proceeding are before the Court on three related matters: (i) a motion by the defendants in the adversary proceeding to compel the plaintiff chapter 7 trustee to comply with an alleged agreement between the parties to settle the adversary proceeding; (ii) a motion in the bankruptcy case by the chapter 7 trustee to approve a separate agreement under which he would permit CleanNet USA, Inc. ("CleanNet"), holder of the bulk of the administrative and non-priority unsecured claims in this case, to continue prosecuting the adversary proceeding for the estate but at its own expense, and CleanNet would guarantee to the estate a minimum return; and (iii) objections by the adversary proceeding defendants to CleanNet's proofs of

claim.  After a two-day evidentiary hearing and by this memorandum, the Court now enters its findings

of fact and rulings of law.

## II.    PROCEDURAL HISTORY

On June 5, 2012, LP&D, Inc. ("the Debtor") filed a petition for relief under chapter 11 of the

Bankruptcy Code, commencing the present bankruptcy case.  In May 2014, the Debtor converted the

case to one under chapter 7.  Upon conversion, John J. Aquino ("the Trustee") was appointed chapter 7

trustee in the case, and he continues to serve in that capacity.

In June 2014, the Trustee filed an adversary complaint against EcoSource, Inc. ("EcoSource"),

Paul Oliveira, and Lisa Ellis-Oliveira, ("Paul," "Lisa," together "the Oliveiras," and with EcoSource "the

Defendants") commencing the above-captioned adversary proceeding.  At the time of the bankruptcy

filing, the Oliveiras were the Debtor's only officers, directors, and equity holders; EcoSource is an entity

to which, shortly before the bankruptcy filing, the Debtor transferred virtually all its assets.  As

amended, the complaint asserts counts for avoidance of fraudulent transfers against each of the

Defendants, breaches of fiduciary duty against the Oliveiras, disallowance and equitable subordination

of the claims of the Oliveiras, and successor liability against EcoSource, 21 counts in all. The Trustee's

prosecution of these claims has been financed to date by a court-approved loan from CleanNet, on

account of which CleanNet presently has a sizable chapter 7 administrative claim in the case.

On May 12, 2016, the Trustee moved in the bankruptcy case for approval of what he calls a

claims litigation agreement with CleanNet ("the CLA").  Under the CLA, (i) the Trustee would assign to

CleanNet the right to prosecute and pursue, *for the benefit of the bankruptcy estate*, the claims that the

Trustee has asserted against the Defendants in the above adversary proceeding; (ii) CleanNet would

guarantee a minimum recovery to the bankruptcy estate of $325,000 plus up to $127,000 to pay the

chapter 11 administrative claim of Debtor's bankruptcy counsel, Nixon Peabody LLP; and (iii) CleanNet's

administrative claim would be capped and quantified.  The Defendants oppose this motion on numerous

grounds, including that CleanNet is not a creditor—that is, its proofs of claim should be disallowed—and therefore may not be assigned the right to prosecute the estate's causes of action.

In view of this basis of opposition, the Court, after a status conference, established a deadline for filing objections to the claims of CleanNet. CleanNet had filed some 53 proofs of claim in the case. The Defendants timely filed objections to all of CleanNet's proofs of claim, asking on numerous grounds that they be disallowed in their entirety.[1] No other party in interest has objected to CleanNet's proofs of claim. CleanNet filed a response to the objections.

On March 23, 2016, the Defendants moved in the adversary proceeding to compel the Trustee to comply with a settlement agreement that they contend they had reached with the Trustee ("Motion to Compel") before he negotiated the CLA. The requested compliance would entail the Trustee's moving under Fed. R. Bankr. P. 9019 for approval of the settlement agreement in the bankruptcy case and, if and when the agreement was approved, dismissing the adversary proceeding in exchange for the Defendants' paying $225,000 to the Trustee and Nixon Peabody's waiving its chapter 11 administrative claim. The Trustee opposed the Motion to Compel, stating that (i) his settlement negotiations with the Defendants never progressed to the point of a binding commitment; (ii) in any event, no motion to approve a compromise can bind a trustee in bankruptcy until, on motion that it is the sole prerogative of the trustee to bring, the court has approved the proposed compromise, and this never occurred; and (iii) the Trustee cannot bring such a motion because, in view of the considerably richer guarantee of a minimum recovery by CleanNet in the CLA, the Trustee does not believe that it is in the best interests of the estate to enter into the agreement the Defendants now seek to force upon him. After a hearing on the Motion to Compel, the Court initially entered an order denying it. The Defendants then moved for

---

[1] The objections were asserted in three filings, appearing on the docket as doc. nos. 223 (objecting to POC nos. 8,9,10,11,12, 13,14,15,16,17,18,19,20,21,22,23,24,25,26,27,28,29,30,31,32,33,34,35,36,37,38,39,40, and 41), 224 (objecting to POC nos. 4,5,6,42,43,44,45,46,47,48,49,50,51,52,53,54,55,56, and 58), and 245 (objecting to amended POC no. 58).

reconsideration, asking for the benefit of an evidentiary hearing.  The Court granted reconsideration and

held, over two days, a combined evidentiary hearing on the Motion to Compel, the Defendants'

objections to CleanNet's proofs of claim, and the Trustee's Motion to Approve the CLA.  The parties then

submitted proposed findings and conclusions.

### III.    JURISDICTION

The matters before the Court are (i) a motion to compel the trustee in bankruptcy to

compromise rights of the bankruptcy estate, (ii) a motion by the trustee to approve an agreement with

respect to litigation of estate causes of action, and (iii) objections to claims against the bankruptcy

estate.  All three arise under the Bankruptcy Code and in a bankruptcy case and therefore fall with the

jurisdiction given the district court in in 28 U.S.C. § 1334(b) and, by standing order of reference (codified

in the district court's local rules at L.R. 201, D. Mass.), referred to the bankruptcy court pursuant to 28

U.S.C. § 157(a). Each is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1). 28 U.S.C. §

157(b)(2)(A), (B), and (O) (core proceedings include matters concerning the administration of the estate,

the allowance or disallowance of claims against the estate, and other proceedings affecting the

liquidation of the assets of the estate). The bankruptcy court accordingly has authority to enter final

orders as to all three matters.

### IV.    DEFENDANTS' MOTION TO COMPEL TRUSTEE TO COMPLY WITH SETTLEMENT

#### a.  The Motion and the Positions of the Parties

The Defendants seek an order compelling the Trustee to file a motion to approve the

compromise they contend they reached with him.  They contend that the Trustee unconditionally

accepted their offer of settlement and therefore, under Massachusetts contract law, the Trustee is

contractually obligated to seek the court's approval of the agreement, even if he no longer believes the

compromise is in the best interest of the estate.  The Trustee responds that: (i) the agreement never

became more than a work in progress, because (a) the parties had expressly reserved their final assent

until the agreement was fully reduced to a signed writing, which never occurred, and (b) there remained disagreement even on a key term; (ii) in view of Rule 9019's requirement of court approval for a trustee's compromise of estate rights, the Trustee cannot have been bound to the agreement prior to its approval; and (iii) in view of a chapter 7 trustee's obligation to act in the best interest of the estate, he cannot be obligated or compelled to seek approval of a compromise that he believes is not in the best interest of the estate.

### b.  Findings of Fact

In June 2014, the Trustee commenced the adversary proceeding in which this motion arises. From the start, the Defendants were jointly represented in the adversary proceeding by attorney Peter J. Haley ("Haley"), and the Trustee was represented by attorney Michael Franco ("Franco").  In order to finance Franco's prosecution of the adversary proceeding, the Trustee, with the Court's approval, had entered into a no-interest financing agreement with CleanNet. Under this agreement, CleanNet would advance up to $250,000 to fund counsel's fees and other litigation expenses and, in exchange, receive a lien on any recovery in the action and a superpriority administrative claim in the case for amounts it advanced under the agreement.

From November 2015 into January 2016, Haley had a series of telephone conversations directly with the Trustee about potential resolution of the adversary proceeding. By the end of January, the Defendants had expressed a willingness to meet one of the Trustee's demands, that they pay to the bankruptcy estate the sum of $225,000.  The Trustee had a second major demand, that Nixon Peabody agree to waive the entirety of the administrative claim it was asserting for services it had rendered to the Debtor during the chapter 11 phase of the case.  Haley indicated to the Trustee that he had spoken with Nixon Peabody and determined that the firm was willing to meet this condition, but the Trustee had no direct communication with Nixon Peabody to confirm this.  The record is devoid of evidence of the substance of communications between Haley and Nixon Peabody.

In view of the expressed agreement between the Defendants and the Trustee, but not yet Nixon Peabody, on these two terms, the Trustee and Haley agreed to take their three-party agreement-in-process to the next level, a definitive writing.  Haley agreed to prepare and circulate a draft.  It took Haley approximately five weeks to prepare and send a draft, during which time there were no further communications between the Trustee and Haley regarding settlement.

In the meantime, the Defendants and the Trustee filed a joint motion in the adversary proceeding to extend pretrial deadlines pending, they said, "the parties' efforts to negotiate definitive settlement documentation and the Court's consideration of any such settlement pleadings."  In the motion they further stated: "The Parties have reached agreement in principle regarding the primary terms of a prospective settlement resolving the Trustee's claims in this matter.  The aforesaid agreement in principle is subject to the documentation of a definitive written settlement agreement in a form and substance acceptable to the Parties, and approval of the Court."  Both parties thus viewed such agreement as they had reached to date as tentative and "subject to" both a "definitive" writing that needed to be "acceptable to the Parties" and the approval of the Court.

In the weeks while he awaited a draft from Haley, the Trustee began to discuss the contemplated agreement with attorneys for CleanNet.  CleanNet held the vast majority of the filed non-priority unsecured claims in the case, both in number and in total value, and it also held a superpriority administrative claim for the moneys it had advanced to the Trustee to fund his litigation of the adversary proceeding and also a lien on the adversary proceedings proceeds to secure the same. The Trustee believed, and reasonably so, that he would need CleanNet's support, or at least non-opposition, to obtain the Court approval that he then intended to seek for the agreement in progress. The Trustee was also obligated under his financing agreement with CleanNet to keep CleanNet apprised, from time to time, of the status of the litigation.

Upon hearing the principal terms around which the contemplated settlement was being structured, CleanNet told the Trustee that it believed the value of the settlement was grossly inadequate and that it would oppose a motion to approve a settlement on those terms.  By letter of February 17, 2016, the Trustee responded that he was unpersuaded by CleanNet's views on valuation and intended still to submit the contemplated settlement for approval.  He also rejected an alternative proposal, floated by CleanNet, to auction off his claims against the Defendants.  But he also indicated a willingness to consider an offer from CleanNet, if it were willing to make one, to purchase the claims in litigation for a greater return than the proposed settlement. This invitation sparked interest and further discussions that led, by February 26, 2016, to agreement on the economic terms, though not the form, of what eventually became the CLA.

On March 4, 2016, Haley emailed to the Trustee a draft settlement agreement (the "Draft Agreement") for his review.  In paragraph 1, entitled Effective Date, it stated:  "This Agreement shall become effective upon entry of a Final Order by the Bankruptcy Court approving the terms and conditions of the Agreement."  In a paragraph entitled Conditions Precedent, it stated:

> The satisfaction of each of the following shall constitute conditions precedent to the Trustee's obligations under this Agreement:
> (a)  Trustee shall have received this Agreement fully executed by the Defendants with all exhibits attached;
> (b)  The Defendants shall have executed and delivered to the Trustee each of the deliverables required by Paragraph 3 above; and
> (c)  The Bankruptcy Court shall have entered a Final Order in a form and manner satisfactory to the Trustee approving this Agreement and documents required by this Agreement.

These provisions reflect Haley's understanding of the settlement that was then in process between the Defendants and the Trustee.  By virtue of these provisions, I find that as of the date he circulated the Draft Agreement, Haley understood that the Trustee could have no obligation thereunder until both (i) his receipt of a settlement agreement in writing and fully executed, complete with exhibits and all

deliverables and (ii) the approval of the same by final order of the Bankruptcy Court.  Also, nowhere did the Draft Agreement expressly obligate the Trustee to seek the Bankruptcy Court's approval.

Regarding the obligation of Nixon Peabody, the Draft Agreement stated: "Nixon Peabody will not seek to recover from the Settlement Proceeds any fees and expenses it has incurred in this matter and which may be allowed by the Bankruptcy Court."  This language did not reflect, and the Draft Agreement did not include, the full waiver that the Trustee had insisted on and that Haley had told him that Nixon Peabody was willing to provide.  On the basis of Haley's inclusion of this language in the draft, I find that the Defendants have not carried their burden of proving that the three parties ever reached the so-called "agreement in principle" on which the present motion is predicated.  Agreement on one of two essential terms had been illusory.

By the time he received the Draft Agreement from Haley, the Trustee believed the alternate agreement he was negotiating with CleanNet was of much greater value to the estate than the agreement in process with the Defendants.  He concluded that he could not, consistent with his fiduciary duties to the estate, seek approval of the latter and that, in any event, in view of the considerably richer "counteroffer" that became the CLA, a motion to approve the settlement with the Defendants would be opposed by CleanNet, indefensible, and futile. His views on these issues were reasonable, well founded, and well within the bounds of sound business judgment. He resolved not to pursue further the settlement in process with the Defendants.  Instead, he has moved for approval of the CLA.

### c.  Discussion

The Defendants seek an order compelling the Trustee to move for approval of the settlement agreement they contend they reached with him, and they would found the Trustee's obligation to so move on a contract, an alleged agreement to compromise.  For the following reasons, I find and conclude that no contract was ever formed.  As a simple matter of Massachusetts contract law—without

considering the complicating requirements in Fed. R. Bankr. P. 9019(a)—the Trustee never made an enforceable promise to compromise.[2] There were at least two shortcomings in the formation of the contract that the Defendants contend was formed.

First, the Defendants themselves say the contract was formed when the parties reached agreement on the two key terms, but the evidence shows that as to one of these admittedly necessary terms, the parties had *not* in fact reached agreement. The Trustee was insisting on a full waiver by Nixon Peabody of its administrative claim, and he had been informed by Haley that Nixon Peabody had agreed on that term, but the proof does not bear out that Nixon Peabody had so agreed. There was no agreement even on the necessary terms. There is no agreement in principle to enforce.

Second, it is abundantly clear that at every stage, Haley and the Trustee both understood that the terms they were negotiating would bind them, if at all, only upon the occurrence of two events: full execution of a written agreement and approval by the bankruptcy court. When a party to a negotiation lets it be known that his or her expressions of assent to terms in consideration are not meant as a final acceptance until embodied in a fully executed writing and approved by the court, then both the writing and the approval are in fact necessary to contract formation. This is not an instance in which the parties reached agreement and contemplated a writing that would merely memorialize the agreement already reached. Here, the fully executed writing and court approval were understood conditions of the creation of contractual obligation. As neither of these conditions was satisfied, the parties' negotiations could not have matured into contractual obligation, and the Defendants have no contractual basis for an order of compulsion.

For these reasons, the Motion to Compel must be denied.

---

[2] The parties agree that insofar as state law may be relevant here, the applicable law is that of the Commonwealth of Massachusetts.

### V.    DEFENDANTS' OBJECTIONS TO CLEANNET'S CLAIMS

#### a.    Procedural History

The Defendants object to some fifty-three proofs of claim now held and asserted by CleanNet.[3] Of these, fifty-two are claims that CleanNet asserts as assignee (the "Assigned Claims"); that is, they did not arise in favor of CleanNet but in favor of their assignors, and CleanNet now holds and asserts them only as assignee of the rights of the assignors against the Debtor.  The assignors of the Assigned Claims are former franchisees/employees of the Debtor, and each Assigned Claim is for damages under the Massachusetts Wage Act, MASS. GEN. LAWS ch. 149, § 148B (the "Wage Act"); the Assigned Claims total $6,514,899.75. The one other proof of claim ("POC") that CleanNet asserts is No. 58, now in its second iteration.  As originally filed, in No. 58-1, it asserted only a nonpriority unsecured claim in the amount of $415,309.29 (the "Royalty Claim") and identified the basis of the claim as "unpaid royalties under Area Operator Agreement of 1997."[4]

When it became clear that it would be necessary, for purposes of adjudicating the Trustee's motion to approve the CLA, to determine the validity of CleanNet's claims in this bankruptcy case, the Court established August 26, 2016, as the deadline for filing objections to CleanNet's proofs of claim. The Defendants timely filed an objection to all of CleanNet's then-filed proofs of claim (the "Original Objection").[5]

The Original Objection stated three grounds of objection: (i) "the claims asserted by CleanNet are claims for subrogation and are barred by reason of CleanNet's primary responsibility for the claims"; (ii) "CleanNet has not commenced any action seeking contribution within the time period required by

---

[3] Fifty of these were filed in the name of CleanNet. Three more—proofs of claim ("POC") nos 4, 5, and 6—were filed in the name of other entities but later assigned to CleanNet.

[4] In its Post-Trial Brief [doc. #255], at p. 40 n. 8, CleanNet asserts that it first filed its Contribution Claim (as defined below) as part of POC No. 58-1.  This is false.  There is no mention of the Contribution Claim in POC No. 58-1.

[5] The objection was filed first as doc. #223 and then (six minutes later) again as a "supplemental objection" as doc. #224.  The two documents appear to be identical. I am treating #223 as superseded and #224 as the Original Objection.

M.G.L. 231B § 3"; and (iii) "[t]he claims of CleanNet against the Debtor should be set off by the Debtor's claims against CleanNet for breach of contract; breach of duty of good faith and fair dealing; negligent design and implementation of franchise system; negligent oversight of franchise system and model, and the knowing failure to comply with the terms and conditions of the Massachusetts wage law."

On November 29, 2016, before a hearing was held on the Original Objection, CleanNet filed POC No. 58-2, which amended No. 58-1 by adding to it a claim for contribution under MASS. GEN. LAWS ch. 231B (the "Contribution Claim").  By virtue of the amendment, the asserted claim increased in amount to $8,195,309.29.  The Contribution Claim asserts a right to contribution under Massachusetts law from the Debtor for monies that CleanNet paid to the Debtor's former franchisees/employees pursuant to an agreement settling a class action they brought against CleanNet, and initially against the Debtor, for violations of the Wage Act.  CleanNet has made clear that it has asserted the Contribution Claim only as an alternative theory/avenue of recovery to the Assigned Claims, and that if the Court overrules the objections to the Assigned Claims and allows them as filed, it need not also address the Contribution Claim.

The Defendants moved to strike POC No. 58-2 as prejudicial in substance, timing, effect, and intent.  After a hearing, the Court denied the motion to strike but afforded the Defendants additional time to conduct discovery and an opportunity to object to the amended claim.  The Defendants did file a further objection (the "Supplemental Objection," doc. #245) in which it objected to POC No. 58-2 on ten distinct grounds:  (i) the Contribution Claim is contingent and, as such, must under 11 U.S.C. § 502(e)(1)(B) be denied; (ii) CleanNet is not entitled to contribution because there has been no release of claims against the Debtor; (iii) any claim for contribution is time-barred by the contribution statute, ch. 231B, § 3(c); (iv) the claims fail because their assignment to CleanNet was prohibited by the franchise agreements between the Debtor and each assignor and therefore invalid; (v) the claims fail because their assignment to CleanNet was prohibited by Massachusetts law and therefore invalid; (vi) CleanNet's

claims are barred by the doctrine of *in pari delicto*; (vii) the Royalty and  Contribution Claims are barred

by the doctrine of res judicata, because the claims of the franchisees/employees against the Debtor

were disposed of by the judgment that entered in their class action against CleanNet; (viii) treble

damages and attorney's fees are not available under the Wage Act because neither the assignors nor

CleanNet have prevailed in an action against the Defendants; (ix) the Contribution Claim is in the nature

of a claim for subrogation and as such is barred because CleanNet was primarily liable for the Wage Act

claims of the Debtor's former franchisees/employees; and (x) the Contribution Claim is subject to setoff

in the amount of the Debtor's claims against CleanNet.

### b.   Discussion[6]

The burdens with respect to proofs of claim were summarized by Judge Somma in *In re Long*,

353 B.R. 1, 13 (Bankr. D. Mass. 2006):

> A proof of claim executed and filed in accordance with the Federal Rules of
> Bankruptcy Procedure constitutes prima facie evidence of the validity and
> amount of the claim. FED. R. BANKR. P. 3001(f); see also *Juniper Dev. Group v.
> Kahn (In re Hemingway Transp., Inc.)*, 993 F.2d 915, 925 (1st Cir. 1993). In
> order to rebut this prima facie evidence, the objecting party must produce
> "substantial evidence." *United States v. Clifford (In re Clifford)*, 255 B.R. 258,
> 262 (D. Mass. 2000) (*Hemingway Transport*, 993 F.2d at 925). If the objecting
> party produces substantial evidence in opposition to the proof of claim and
> thereby rebuts the prima facie evidence, the burden shifts to the claimant to
> establish the validity of its claim. *Hemingway Transport*, 993 F.2d at 925
> ("Once the trustee manages the initial burden of producing substantial
> evidence . . . the ultimate risk of nonpersuasion as to the allowability of the
> claim resides with the party asserting the claim.").

However, as to each basis of objection, the burden of establishing the validity of its claim is not one of

starting from scratch.  Rather, in view of the prima facie validity of the claim, the claimant's burden of

ultimate persuasion (answering an objection supported by sufficient evidence) is a burden of persuasion

---

[6] I am assuming without deciding that the Defendants' have standing to object to CleanNet's claims. The issue is
more complex than decision of the claims objections; and, in view of the outcome on the claims objection, it would
make no difference if all three Defendants' lacked standing.  Either way, CleanNet would emerge with its Assigned
Claims and Royalty Claim allowed.

only as to the particular objection, of establishing that the defect alleged in the objection either does

not exist or is no defect.  Accordingly I proceed by addressing the Defendants' specified grounds of

objection, beginning with those asserted in the Original Objection, of which there are three, all three

asserted against both the Assigned Claims and the Royalty Claims.

### i.    Subrogation Barred by CleanNet's Primary Responsibility

In their Original Objection, the Defendants objected to the Assigned Claims and the Royalty

Claims on the basis that, being claims for subrogation, they are barred because CleanNet was primarily

liable for the Wage Act claims of the Debtor's former franchisees/employees.  The Defendants do not

explain why they contend that the claims in issue are for subrogation.  They are not.  CleanNet asserts

the Assigned Claims as the holder of those claims by assignment from the persons and entities in favor

of whom they arose.  The Royalty Claim is one that CleanNet asserts for injury to itself, damages under a

contract between itself and the Debtor.  For neither of these claims does CleanNet need or assert a right

of subrogation.  This objection is accordingly overruled as inapposite.

### ii.    Assigned Claims and Royalty Claims Barred as Untimely Contribution Claims

In their Original Objection, the Defendants next objected to "the claims asserted by CleanNet"

on the basis that "CleanNet has not commenced any action seeking contribution within the time period

required by M.G.L. 231B, § 3." This objection too is leveled against the Assigned Claims and the Royalty

Claims, they being the only claims that CleanNet had asserted when the Defendants filed the Original

Objection.  The Assigned Claims and the Royalty Claim are not claims for contribution.  CleanNet neither

asserts nor needs a right of contribution to advance them.  Accordingly, this objection, too, is overruled

as inapposite.

### iii.    Setoff

In their Original and Supplemental Objections, the defendants objected to each of CleanNet's

claims—the Assigned Claims, the Royalty Claim, and the Contribution Claim—on the basis of the

affirmative defense of setoff. The Defendants state that the Debtor has valid claims in tort and contract against CleanNet for breach of contract, breach of duty of good faith and fair dealing, negligent design and implementation of franchise system, negligent oversight of franchise system and model, and knowing failure to comply with the terms and conditions of the Massachusetts wage law ("the Counterclaims").  As the basis for these claims, they asserted that CleanNet was aware of the dangers and failure of the independent contractor model that undelay the CleanNet system yet persisted in marketing that system to the Debtor, causing substantial harm and damages to the Debtor that are no less than those asserted by CleanNet in its proofs of claim.

Notwithstanding their articulation of this basis of objection, they have sought no findings of fact or rulings of law on the specific Counterclaims that form the basis of their defense of setoff. Rather, they have only reiterated the conclusory language from their Objection that the Debtor has claims against CleanNet for breach of contract, breach of duty of good faith and fair dealing, negligent design and implementation of franchise system, negligent oversight of franchise system and model, and knowing failure to comply with the terms and conditions of the Massachusetts wage law.  See Defendants' Proposed Findings of Fact and Conclusions of Law [doc. # 253], p. 29 at ¶ 78.  The Defendants have provided the Court no guidance as to the facts and legal elements of each claim the Defendants would setoff against CleanNet's claims.  The Defendants having effectively supplied no proposed findings or conclusions as to each specific counterclaim, I therefore conclude that they have abandoned this defense.[7]

---

[7] The Counterclaims (whatever their merits) belonged to the Debtor on the date of its bankruptcy filing and accordingly now belong to the bankruptcy estate.  See 11 U.S.C. § 541(a)(1).  Indeed one response of CleanNet to the setoff defense is that, because the Counterclaims belong to the estate, the Defendants do not have standing to interpose them as a defense; rather, CleanNet contends, that prerogative belongs only to the chapter 7 trustee. Having determined that the Defendants have effectively abandoned this defense, I need not determine the standing of the Defendants to prosecute the counterclaims as the basis of a defense of setoff.  However, I hereby make clear that my rejection of the defense as advanced by the defendants has no preclusive effect on chapter 7 trustee.

14

###### iv.   **Failure to Prove the Elements of its Claim**

In their proposed findings and conclusions, the Defendants argue that the Assigned Claims should be disallowed because, at the evidentiary hearing, CleanNet did not prove the elements of the Assigned Claims—for breach of contract and fraud—by a preponderance of the evidence, and because the Assigned Claims for violation of Mass. Gen. Laws ch. 93A fail as a matter of law.  These arguments require no answer because in neither their Original Objection nor their Supplemental Objection did the Defendants object to the Assigned Claims on the bases that that the factual allegations on which they are founded are untrue or lack an evidentiary basis or that the ch. 93A component of those claims fails as a matter of law.  The Defendants had not articulated an objection to which this kind of response, whether evidentiary or legal, would be necessary.  Accordingly, I need not address the prior issue of whether the Defendants themselves have adduced "substantial evidence" that would effectively have shifted the burden to CleanNet on these issues.  CleanNet had no obligation to respond with evidence or argument to an objection not raised before the evidentiary hearing; and basic concerns of fairness and due process prevent the Defendants from raising these objections for the first time after the hearing. The prima facie validity of the Assigned Claims and the Royalty Claim remains undisturbed.

###### v.   **Conclusions as to Assigned Claims and Royalty Claims**

All objections to the Assigned Claims and the Royalty Claims having been overruled, the Assigned Claims shall be allowed as filed and the Royalty Claims shall be allowed in the amount of $322,247.43.[8]

###### vi.   **Objections Asserted in Supplemental Objection**

In their Supplemental Objection, the Defendants asserted objections to CleanNet's Contribution Claim, which was filed only as an alternative to the Assigned Claims.  The Assigned Claims having been

---

[8] CleanNet filed the Royalty Claim in the original amount of $415,309.29, but the parties have since agreed that the total amount of unpaid royalties is $322,247.43, and CleanNet now limits its Royalty Claim to that amount.

allowed as filed, it is unnecessary to address the Contribution Claim and the numerous objections to it.

Accordingly, the Court will refrain from doing so.

In their Supplemental Objection, the Defendants also asserted further objections to the

Assigned Claims and the Royalty Claim.  Objections to the Assigned Claims and the Royalty Claim needed

to be filed by August 26, 2016, the court-established deadline for filing objections to CleanNet's then-

filed proofs of claim.  The Defendants were granted leave to file a later objection only as to CleanNet's

subsequently-filed Contribution Claim.  Accordingly, the objections asserted in the Supplemental

Objection to the Assigned Claims and the Royalty Claim are overruled as untimely.

**VI.    TRUSTEE'S MOTION TO APPROVE CLAIMS LITIGATION AGREEMENT**

The Trustee has moved for approval of the CLA.  Under the CLA, (i) the Trustee would assign to

CleanNet the right to prosecute and pursue, *for the benefit of the bankruptcy estate*, the claims that the

Trustee has asserted against the Defendants in the above adversary proceeding; (ii) CleanNet would

prosecute the claims at its own expense and guarantee a minimum recovery to the bankruptcy estate of

$325,000; and (iii) CleanNet would receive an administrative claim for the value it provides as this

guaranteed recovery, but only to the extent that its efforts result in cash proceeds for the estate.  The

Defendants oppose this motion on numerous grounds, including (i) that CleanNet is not a creditor and

therefore may not be deputized to prosecute the estate's claims; (ii) that because CleanNet is not a

creditor, but the Oliveira defendants, as equity interest holders in the Debtor, do have interests in the

estate, the CLA is a breach of the Trustee's fiduciary duty to them; (iii) that the CLA is in substance a sale

of estate assets but fails to satisfy procedural and substantive requirements of a sale, and that the

Defendants' own settlement proposal is itself a higher and better counteroffer; (iv) that the agreement

is vague and designed to mislead; (iv) that the claims the CLA would authorize CleanNet to prosecute

include avoidance actions that a trustee is not free to sell or assign; (v) that particular creditors should

not be permitted to pursue avoidance actions for their exclusive benefit; (vi) and that this is in fact also a

compromise of estate rights and, as such, requires approval under the standards governing Rule 9019 compromises but fails to meet those standards.

### a. Findings of Fact

The Debtor, a Massachusetts corporation, was formed in 1997.  Throughout its corporate existence and prior to the commencement of this Chapter 7 case, the Debtor's officers have been Paul and Lisa, with each of them serving at various times as President of the Debtor. At the time of the commencement of this Chapter 7 case, Lisa was the Debtor's President and Treasurer, and Paul was its Secretary. In 1997, the Debtor and CleanNet entered into a certain Area Operator Agreement ("AOA") pursuant to which CleanNet designated the Debtor as its master franchisee in multiple Massachusetts counties for the sale of CleanNet commercial cleaning business franchises. The Debtor's duties as master franchisee were, among other things, to solicit prospective franchisees to purchase franchises, to enter into franchise agreements with those franchisees, and to perform certain duties for those franchisees. From June 1997 to the commencement of the Debtor's chapter 11 case, the Debtor entered into approximately 590 unit franchise relationships. These relationships were memorialized by formal franchise agreements (the "Franchise Agreements").

Beginning in or about 2008, the Debtor, CleanNet, and others were named as defendants in multiple actions that asserted that the franchisees doing business in Massachusetts had been misclassified as independent contractors when they should have been classified as employees. In these actions, certain current and former franchisees claimed damages against the Debtor in amounts which the Debtor then represented were vastly in excess of its assets and ability to pay.

On June 1, 2012, the Debtor transferred substantially all of its assets to EcoSource in exchange for a cash payment of $12,500 and the assumption by EcoSource of up to $97,300 of the Debtor's obligations pursuant to a loan agreement with People's United Bank ("Peoples"). EcoSource is owned by Lisa's father. Paul is the general manager of EcoSource. Immediately prior to the transfer, the

approximate monthly revenue stream of the Debtor was $500,000. The revenue was derived from the

commercial cleaning accounts being serviced by then active franchisees. These accounts constituted the

principal asset of the Debtor transferred to the Transferee.

On June 5, 2012, the Debtor filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy

Code (the "Petition Date"). As of the Petition Date, the Debtor was no longer operating its business. The

chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code on May 7, 2014, and

the Trustee was appointed thereafter on May 7, 2014.

On June 4, 2014, the Trustee instituted an adversary proceeding styled John J. Aquino, Chapter 7

Trustee v. EcoSource, LLC, Paul Oliveira and Lisa Ellis-Oliveira, Adversary Proceeding No. 14-1107 (the

"Adversary Proceeding"), in which the Trustee sought recovery on account of the alleged fraudulent

conveyance of the Debtor's assets to EcoSource, and recoveries and related equitable relief as against

the Debtor's principals on account of asserted breaches of fiduciary obligations in connection with the

aforesaid conveyance as well as recoveries of additional alleged fraudulent conveyances to them

individually. The Complaint in the Adversary Proceeding was subsequently amended on May 28, 2015

(the claims asserted by the Trustee in the Adversary Proceeding, as amended, are hereinafter

referenced as the "Claims").

With approval of the Court pursuant to an Order entered on December 19, 2014, the Trustee

retained the firm of Beauregard, Burke & Franco ("BB&F") as special counsel for the Adversary

Proceeding.

With approval of the Court in an Order entered on January 13, 2015, the Trustee entered into a

limited recourse post-petition financing agreement with CleanNet (the "Loan Agreement") which

provided the Trustee with the ability to fund litigation of the Adversary Proceeding. CleanNet is a

creditor in the within case, having (as determined above, over the objections of the Defendants) allowed

non-priority unsecured claims totaling $6,837,147.18 (Assigned Claims of $6,514,899.75 and the Royalty

Claim of $322,247.43).  Under the Loan Agreement, CleanNet also holds a superpriority administrative

claim for amounts due it under the Loan Agreement, and it also holds a security interest in the Claims

and any recoveries thereon to secure amounts due it under the Loan Agreement.

The Adversary Proceeding has been prosecuted diligently and remains pending.  The Trustee is

very confident in the merits of the claims asserted in the Adversary Proceeding and he believes that

further litigation of the Adversary Proceeding will result in the entry of a significant judgment in favor of

the Trustee.

As I found above in conjunction with the Defendant's Motion to Enforce Settlement Agreement,

the Trustee and the Defendant engaged in negotiations regarding the terms of a potential settlement of

the Claims. More particularly, in late January 2016, the Trustee and Defendants' counsel discussed

resolution of the Adversary Proceeding based upon a cash payment to the estate of $225,000, plus the

waiver of all claims against the estate. An agreement in principle was reached based upon the foregoing

terms, subject to the drafting and execution of a definitive settlement agreement acceptable to the

parties, and subject to Bankruptcy Court approval. Defendants' counsel offered to produce the first draft

of a settlement agreement.

In the course of postponing a scheduled deposition of CleanNet personnel, Defendants' counsel

informed CleanNet that a settlement of the adversary proceeding had been reached. Pursuant to the

terms of the Loan Agreement, the Trustee is obligated to keep CleanNet informed of the status of the

litigation. As the result of the notification by Defendants' counsel, CleanNet's counsel contacted the

Trustee to obtain an update as to the status.

The Trustee and his counsel participated in several telephone conversations with CleanNet's

counsel regarding the agreement in principle for the settlement of the adversary proceeding. During

such conversations, it was clear that CleanNet did not share the Trustee's views regarding the

assessment of the economic value of the Claims. The differences of opinion between the Trustee and

CleanNet did not concern the merits of the Claims but rather collection issues. The Trustee viewed the

terms of the proposed settlement with the Defendants acceptable in light of the estimated continuing

litigation costs and the risk that any judgments obtained in the Adversary Proceeding might be

hampered by collection difficulties.

In light of the differing views, CleanNet expressed an interest in pursuing an alternative

transaction pursuant to which CleanNet would guaranty a return on the litigation in excess of the

amounts proposed to be paid by the Defendants, would acquire the right to prosecute the claims on

behalf of the estate (without any additional cost to the estate), and would acquire the right to all, or a

percentage of the proceeds of the adversary proceeding. By providing for a guaranteed return on the

Claims for the estate which was greater than would be provided in the settlement discussions with the

Defendants, CleanNet addressed and satisfied the Trustee's concerns regarding collectability. In effect,

the risks of collection under the terms of an alternative transaction would fall on CleanNet.

On or about February 26, 2016, CleanNet and the Trustee reached agreement with respect to

the economic terms of an alternative transaction. The alternative transaction with CleanNet initially

contemplated a guaranteed payment to the estate of $325,000 payable on closing, continued

prosecution of the claims asserted in the Adversary Proceeding at no additional cost to the estate, and

the establishment of an escrow fund for the purpose of funding any allowed claims of Nixon Peabody

(net of retainers held by Nixon Peabody). The initial terms discussed provided that CleanNet would be

entitled to retain any future proceeds of the Claims for its own account. Thereafter, the economic terms

were modified to require that all proceeds of the Adversary Proceeding would be turned over to the

Trustee for the benefit of the estate to be distributed in accordance with applicable priorities, subject to

an administrative claim issued for the benefit of CleanNet as hereafter described.

As the Trustee informed Defendants' counsel after reaching this agreement with CleanNet, the

Trustee believes that the economic terms of the CLA are superior to the terms of the settlement he had been negotiating with the Defendant and that his fiduciary duty dictates proceeding with the CLA.

The CLA, a copy of which is attached to the Trustee's motion for its approval, includes the following terms:

1) Regarding the litigation, liquidation, and control of the Claims:

    a) The Trustee will permit CleanNet to pursue the Claims.

    b) The permitted pursuit is on behalf of the bankruptcy estate.

    c) Any and all recoveries will be paid to the Trustee for the benefit of the bankruptcy estate, without deduction for any cost or expense incurred by CleanNet in effecting the recoveries.

    d) CleanNet will, in continuing the Adversary Proceeding and pursuing the Claims, be entitled to file all pleadings, conduct all discovery and take such other action as CleanNet may determine to liquidate the Claims. CLA §6(b).  It follows that the Trustee is relinquishing control of the prosecution, litigation, and settlement of the claims to CleanNet.

    e) Notwithstanding the foregoing, CleanNet will not abandon, release or compromise any of the Claims or settle the Adversary Proceeding without Bankruptcy Court approval. CLA §6(b).  It follows (though the Agreement does not say so expressly) that CleanNet will be obligated to prosecute the claims to conclusion unless and until a compromise or abandonment is approved by the Court.

    f) If the Trustee's counsel employed in the Adversary Proceeding for any reason elects to withdraw as counsel in the Adversary Proceeding or otherwise in the pursuit of the Claims, CleanNet may at its sole expense select and, subject to any required approval by the Bankruptcy Court, employ other counsel in the Adversary Proceeding. CLA §6(e).

2)  Regarding who shall bear the costs of litigation going forward: CleanNet's pursuit of the claims going forward will be at it sole cost and expense. CLA §6(a).  All attorney's fees and other costs of litigation will be CleanNet's.  The estate bears no responsibility for these costs.

3)  Regarding what CleanNet will give the estate:  At the closing of the CLA, CleanNet will give/pay the estate:

    a)  a release of the estate's obligation under the Loan Agreement, the "Loan Amount";[9]

    b)  the difference between $325,000 and the Loan Amount; and

    c)  through an escrow arrangement, the allowed amount of the "Net Nixon Peabody Claim" in the Debtor's bankruptcy case, but not more than $127,000.[10]

4)  Regarding what CleanNet gets from the estate (aside from the right to pursue the Claims): Upon the closing of the CLA, CleanNet will be deemed to have an allowed administrative claim equal to the lesser of (a) $452,000 minus the sum of the Loan Amount and the Escrow Balance [i.e., $127,000 minus the Net Nixon Peabody Claim] and (b) the amount of cash proceeds from the Claims actually turned over to the Trustee.  This provision is designed to allow CleanNet to recoup the amounts it is paying the estate under the CLA ($452,000 less the Escrow Balance), which is in essence an advance, guaranteed recovery on the Claims, but only if and to the extent that CleanNet succeeds in recovering cash proceeds from the litigation.  The estate incurs this administrative expense only if and to the extent that it

---

[9]  The Loan Amount, which, given its priority, is in essence the value of this release, is neither quantified by the CLA nor in evidence.

[10] The Nixon Peabody Claim is the application for compensation of Nixon Peabody LLC for services rendered as counsel to the Debtor during the chapter 11 phase of this case.  Just before the preliminary hearing on the Trustee's Motion to Approve the CLA, the Nixon Peabody Claim was resolved by an approved stipulation under which Nixon Peabody application was allowed, and the firm was permitted to apply some $70,000 in prepetition retainers against it, but Nixon Peabody waived any right to payment of the balance of the claim from the estate. Accordingly, the amount of the Net Nixon Peabody Claim is zero, and the provision for its coverage in the CLA is vestigial.

receives further litigation proceeds.  If the litigation results in no recovery, the estate incurs

no further administrative expense to CleanNet and thus is insulated from risk of

administrative insolvency.  Notably, this administrative expense is capped at the amounts

advanced to estate through the CLA; it does not permit CleanNet to recover from the estate

the attorneys' fees and expenses it incurs to prosecute and pursue the Claims.

5) Regarding related loose ends:

    a) Loan Agreement:  the Loan Agreement will terminate, CleanNet will have no further

       obligation to advance funds to the Trustee under the Loan Agreement, and the Trustee

       will owe no further amount to CleanNet under the Loan Agreement.

    b) Escrow Arrangement:  CleanNet will pay to the estate the allowed amount of the Net

       Nixon Peabody Claim as follows:  At the closing, it will pay the Trustee $127,000, who

       will hold the same in a separate escrow account; then, promptly upon the entry of a

       final order of the Bankruptcy Court determining the allowed amount of the Net Nixon

       Peabody Claim in the Debtor's bankruptcy case, which order is not subject to appeal or a

       stay and for which all appeal periods have expired, the Trustee will transfer funds equal

       to the allowed amount to the estate, free of the escrow, and will remit the balance of

       the Escrow Funds (the "Escrow Balance") to CleanNet for CleanNet's own account.

The Defendants have contended that CleanNet is not a creditor, by which the Defendants mean

that they dispute the validity of CleanNet's non-priority unsecured claims. CleanNet is an administrative

creditor by virtue of its rights under the Loan Agreement; the Defendants have never disputed this.  And

by virtue of the above adjudication of the CleanNet Assigned Claims and Royalty Claim, it is now clear

that CleanNet holds allowed non-priority unsecured claims totaling $6,837,147.18.  Moreover,

CleanNet's are the only unsecured non-priority claims in the case. That is, all distributions in this case

after those on administrative and other priority claims will go to CleanNet.  CleanNet's interest in

prosecuting the Claims is thus entirely consistent with the interests of the estate in the prosecution of

the Claims.  And CleanNet clearly is highly motivated to prosecute the Claims and to maximize the

recovery thereon.

The Defendants have asserted a number of objections to the CLA that are, in essence,

arguments that the CLA would harm the estate and, they imply, through the estate harm the

Defendants themselves.  However, Defendant EcoSource has no interest in the estate whatsoever; it is

not a creditor and has no equity interest in the Debtor and would not be affected through the estate by

the approval (or not) of the CLA.  Its only interest in the CLA is as an adverse party to the litigation that

the CLA would enable the estate, through CleanNet, to continue.  The same is essentially true of the

Oliveira Defendants.  They are not creditors in this case.  It is true that they are equity holders in the

Debtor, and if this estate were sufficient in size to return a surplus to the Debtor, they as equity holders

would stand to benefit, but that is not remotely in the realm of possibility here.[11]  Like EcoSource, the

Oliveiras' only real interest in the CLA is as an adverse party to the litigation.  And in any event, their

interest in the estate, such as it is, is junior to CleanNet's massive unsecured claim.

**b. Discussion**

Given the above findings, the Defendants' objections fall readily away.

First, the CLA is not ambiguous, much less designed to mislead.  Its elements and workings are

clear.

Second, it is not the case that CleanNet is not a creditor.  CleanNet is twice a creditor of this

estate: first as the holder of a superpriority administrative claim and second as the holder of a massive

nonpriority unsecured claim.  Under the CLA, its superpriority administrative claim would be released,

but CleanNet would acquire an administrative claim to make it whole for the monies it advances to the

---

[11] The debtor is last in the order of priority for distribution. 11 U.S.C. § 726(a)(6).  Before estate assets can be
distributed to the debtor, creditors at every senior level must be paid in full with interest. § 726(a).

estate under the CLA, but only if and to the extent that its efforts in pursuing the Claims yield cash

proceeds for the estate.  By virtue of this administrative claim and especially of its $6.8 million non-

priority claim, CleanNet's interests in prosecuting the Claims are entirely consistent with those of the

estate.  Indeed the vast majority of the claims against the estate are CleanNet's.

Third, the CLA is not a sale of the Claims.  By the terms of the CLA, CleanNet must pursue the

Claims on behalf of the estate, and all proceeds of the Claims, whether obtained by judgment and

collection or by compromise, belong to the estate. The CLA, in effect, guarantees a minimum return to

the estate but by no means caps the ultimate return or transfers it to CleanNet.  All upside continues to

belong to the estate. The estate and the Trustee part only with control of the prosecution of the Claims,

but even in this, not wholly:  CleanNet may not compromise or abandon the Claims without Court

approval.  In sum, the estate parts with virtually nothing.  So this is not a sale.  Therefore sales

procedures need not be followed, the CLA need not be evaluated as a sale, and restrictions on the sale

of avoidance actions do not apply.

Fourth, the CLA is a good and creative deal for the estate.  It assures to the estate a *minimum*

return on the Claims of $325,000.  This is a full $100,000 more than the Defendants' settlement offer

would provide as the *total* return on the claims.  And the CLA ensures that the Claims will be prosecuted

at no expense to the estate, such that the estate's ultimate return will not be diminished by such further

attorney's fees and other expenses as may be needed to obtain it.  The risk of loss thus falls wholly on

CleanNet—which happens to be the creditor with the most interest in its prosecution—and this frees

the Trustee of the risk of administrative insolvency that was limiting his freedom to prosecute the

Claims.  The Trustee has carefully considered and crafted the CLA and, in the exercise of his business

judgment, has determined that it is in the best interest of the estate.  The administration of bankruptcy

estates is entrusted not in the first instance to the bankruptcy courts but to trustees in bankruptcy; the

role of the Court is not to make administrative decisions but only to review the Trustee's judgment for

abuse of discretion.  I find none here.  The Trustee's judgment is sound.

Fifth, the CLA does not authorize CleanNet to prosecute avoidance actions, or any of the Claims,

for CleanNet's *exclusive* benefit.  Rather, it clearly requires that the claims be prosecuted on behalf of

the estate, and the CLA does not alter the Code-prescribed distribution scheme. It is true that CleanNet

is the estate's largest creditor and, at the level of nonpriority unsecured claims, its only creditor, but

creditors are entitled to the benefits of the Bankruptcy Code regardless of how numerous they are.[12]

The purpose of the CLA is to make it possible for all the estate to have the benefit of the Claims,

notwithstanding the present lack of funds in the Estate to finance the litigation.

Sixth, this is not a compromise of estate rights.  The Claims are not being compromised.

Accordingly, it would not be appropriate for the CLA to be evaluated under the standard for Rule 9019

compromises.

Seventh, the Defendants' pretense of standing to object on the basis that the CLA would harm

the estate and them as parties having interests in the estate is false.  The Defendants have no hope of

recovery through the estate from the Claims at issue, and the CLA will make no difference in this fact.

Their contention that the CLA constitutes a breach of the Trustee's fiduciary duty to them therefore falls

flat. In any event, the Trustee's fiduciary duty is first to maximize the distribution to claims senior to the

Oliveira Defendants' equity interests, the administrative claims and CleanNet's mammoth nonpriority

claims.

This exhausts the Defendants' objections.

Having determined that the CLA is neither a sale of property of the estate nor a compromise of

claims belonging to the estate, I nonetheless hold that the CLA is a use of property of the estate outside

---

[12] And it is not CleanNet but the Oliveira Defendants who put the Debtor into bankruptcy in the first place and then
converted this case to one under chapter 7.

of the ordinary course of business.  The Bankruptcy Code states that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  By virtue of his motion to approve the CLA and the hearings held on it and on the Defendants' objections, the requirements of notice and a hearing have been satisfied.  It remains only to dispose of the Defendants' objection.[13]

There is substantial case law, which I now follow, that allows for the prosecution of estate claims by creditors on behalf of the estate provided that all proceeds are paid to the estate and the trustee remains in control of the funds and the distribution process. See, *e.g.*, *In re Robert R. Greenberg*, 266 B.R. 45, 51 (Bankr. E.D.N.Y. 2001) (trustee's authority to pursue claims may be properly assigned provided that such authority is limited to the pursuit of claims on behalf of estate, and subsequent recovery is equitable distributed to creditors under trustee's supervision). *See also*, *In re Vogel Van & Storage, Inc.*, 210 B.R. 27, 33-34 (N.D.N.Y. 1997), *aff'd on other grounds*, 142 F.3d 571 (2d Cir.1998) (trustees may "deputize" creditors to litigate preference actions on behalf of trustee as long as fruits of action belong to estate and arrangement doesn't threaten equitable distribution of estate assets). It follows that what the Trustee seeks to do is not prohibited by the Bankruptcy Code.

This leaves only the question of whether the CLA is in the best interest of bankruptcy estate. The Trustee, in the exercise of his business judgment, has determined that it is, and for reasons outlined above, I find that his judgment on this issue is sound, not an abuse of discretion.  Accordingly, the Court will by separate order approve the CLA.

Date:  September 24, 2018

_Frank J. Bailey_
Frank J. Bailey
United States Bankruptcy Judge

---

[13] Section 363(b)(1) requires only notice and a hearing, not court approval, and therefore, as far as the statute is concerned, it would be sufficient to sustain or overrule the objection; actual allowance, or permission, is not required.  The Trustee, understandably, has requested an order of allowance or disallowance.  The Court will provide one but in doing so does not purport to modify the applicable standard.